Our next case is Oasis Tooling v. Siemens Industry Software & Global Foundries, 2024, 28-5 and 8-6. Mr. Frankel. Good morning, Your Honors. May it please the Court. Focusing on Step 2, the District Court committed reversible error in finding on summary judgment that the asserted claims were limited to subject matter that was conventional, well-known, and routine. There was ample record evidence from which the fact finder could have found, with the benefit of all reasonable inferences, that the claims covered subject matter that was important and not conventional and not routine. Well, the Court found that this was essentially a mental process, plus conventional computer components, which translates to ineligibility. Correct. That's what the Court found. And the problem with that finding is that there was contemporaneous evidence from a leading technology company, Texas Instruments, that the idea of a canonical form digest was not conventional. There was expert testimony from Dr. Paul Min that nothing like a canonical form digest had been done. Did that evidence use what I think I'm remembering? You'll correct me about this. The claim construction of canonical form, which was eventually adopted, which is very broad. The definition of canonical form was broad. It required a reduction in sensitivity to nonfunctional variations. Now, there are many cases, including... Not to all, just some reduction. Even that, that reduction could be very small, could, I think, cover and be limited to change two white spaces to one white space. Yes, and the District Court really got sidetracked with the white space issue. Any patent claim, including the ones at issue in McCrow and Fish and the other leading cases finding subject matter patent eligible, you can come up with a contrived edge case example where there's limited benefit. But we do, I think, just out of my general recollection from a dozen years of doing this, a kind of argument we get frequently in 101 cases is look at how big a problem and the size of data that we're dealing with. And here's a system for handling that size. What, if anything, in this claim depends on the size of the data? Or could this be a two-cell chip with three bits of design information? For purposes of step two, we are not relying on the fact that the particular context is chips. And we're not focusing on the fact of the volume or the size issue. The inventive concept comes from combining a canonical form with a digest. Now, the Brin article, which the court focused on to say that this was nothing more than conventional and routine, was something very different. That was comparing two texts. There was nothing in the text that was functional or not functional. Why does that matter? Because the canonical form has to reduce sensitivity to nonfunctional variations. So the problem was plaguing. So that was basically about plagiarism, right? Correct. Changing every such a thing as just ignoring the unimportant in deciding whether plagiarism exists. I thought that that's what's going on here, too. Respectfully, that's not what's going on, which is the reason that the court should have allowed the experts to talk about what the Brin reference teaches and doesn't teach. This is a single article. A single article does not establish that a concept is well-known, routine, and conventional. The problem that people had is that you can express functional designs differently in computer chip languages. And the way that people were comparing computer chips was with these simple differencing tools that were completely unable to detect any variation whatsoever, and the differencing tools would say these are different. And that created all kinds of problems in the industry. The inventive concept, this was the flash of genius, was to say let's take the computer chip designs. Let's break it down. Let's parse it to the smallest possible components. Let's put them into a particular data structure, a syntax tree, which removes already a lot of the sensitivity to the way it's expressed because it's an organized hierarchical structure. Then let's take each of those components and put it into a standardized, normalized form. There are dozens of columns in the specification that talk about how to do that with the specific computer languages available at that time. But I guess maybe I'm misunderstanding your argument. I think our case law is clear that when you're assessing step two, you've got to take the abstract idea out of it.  I'm not hearing you doing that. Now this goes to the flaw in the court's step one analysis, which was to say that the abstract idea was just analyzing data. If you say that all that is being claimed is analyzing data, then the question is, is there an inventive concept that goes beyond analyzing data? And there is. The inventive concept is this process of breaking the design down into the individual components, organizing them in a specific way, normalizing them in a specific way, and only then digesting the data. Those several uses of your phrase in a specific way is kind of where the action is. The claim says normalize. It doesn't say normalize in the following way, et cetera. It requires normalization to reduce sensitivity to non-functional variation, which is different from just normalizing data. The personal web case talks about taking documents and hashing them and using that to determine if they're the same. The difference is that a hash of a – if you take a file and you hash it without first removing some of the sensitivity to non-functional variations, then any change, no matter how trivial, is going to get a false hit, a false negative. And that was the problem the industry had. It was a very tough problem to take these computer chips and figure out a way to reduce the sensitivity. That's the enablement. If the question is that's a tough thing to do, does the patent teach the practitioner how to do that, the answer is yes. There's this detailed disclosure in the specification of how you can reduce sensitivity. By the way, there are dependent claims that do get into, for example, comparing the GDS2 language to the OASIS language, and in the specification, there's a specific enabling disclosure of how to do that. There are dependent claims that talk about using this technology to do a royalty audit, which requires certain types of checks, and that's described in the specification for how to do that. The district court could not properly disregard the possibility that this was an inventive concept at the time. The district courts, if you read the decision carefully, and defendants repeatedly argue this in their briefing, they say it was undisputed that this technology was conventional. And the district court said it was long known to, this technology was long known, citing only the Brin article. That's the only evidence in the record that anyone cited that this was conventional, routine, and well known. So you've spoken a couple of times now about evidence in the record. This was on 12B-6, is that right? Summary judgment. This was summary judgment.  So the district court. Are we calling correctly that he rejected this on 12B-6? Oh, this is the one. Okay. This is the one where he said he wanted to know more, and now I'm doing claims. Yes. Sorry about that. Yes. Yes. Correct. So, you know, in the intervening time from the decision on the 12B-6 to summary judgment, we took the deposition of Texas Instruments. There's hours and hours of testimony where the person at Texas Instruments who evaluated the technology said, this is something new. This is something great. This is something we haven't seen before. This is something that solves our problems. Giving the benefit of every reasonable inference, hearing that person testify alive, hearing that person cross examined, having the experts battle it out over what he was talking about, looking at the software that OASIS made that carried out its claims, hearing the expert explain how the scope of the software is coextensive with the scope of the claims, hearing the other side's experts say why he disagreed, hearing the inventor testify, considering the statements and the specification about the flaws with the conventional technology and how this was something different. Only then could this factual dispute have been resolved. And if you find that there's a triable issue of fact, just a material dispute over if this was purely conventional technology or there was something different, there was some kernel of inventive concept, then the summary judgment has to be reversed or at least vacated for further proceedings. I'll turn now to your point about the mental steps. And we do not agree that this process had an analogy in purely human mental processes. The way that people compare things is they look at them and they make a subjective determination if they are the same or not. Going back to the inventive concept here of taking the data, breaking it down into its individual components, and then parsing them, putting them into a syntax tree, normalizing them, only then running it through a hash to create a unique number and using that hash to make a comparison is not how a librarian would find books in a library using a call number. It's not how a person would look at a red line and decide if the differences were significant or not. A hash value creates a one-to-one ratio. Whatever your exact specific thing is, you get a short number and you can use that for comparison. That's a dumb comparison. The hash number doesn't tell you anything of substance. The OASIS idea, and their marketing term for this was a smart signature, is that by going through the process first and then creating a hash, you go from a one-to-one dumb comparison to a one-to-many comparison where that hash value now tells you something very important and functional, which is that it corresponds to anything that has the same functional design. Therefore, there's no analogy to the human mental process that went into the claimed inventions. If you have no further questions, I'll save the rest of my time. We will do that. Mr. Bell. Good morning, Your Honor. May it please the court. The district court here took a very careful approach to one-to-one, considered it on the motion to dismiss, ultimately then decided it needed more information, held an extensive claim construction proceeding in which it construed the claims quite broadly, including as to the key terms that were relevant to eligibility, and then revisited eligibility at the summary judgment stage and said in light of those claim constructions, which he found very useful to his consideration, found it ineligible. And so I'd like to talk about a couple of those. The first is the canonical form, and I'll focus where my friend focused on the canonical form digest. He spent a little time on step one. I'll just spend a little time there as well. There's nothing specific about the canonical form digest. All it is is parsing, standardizing, digesting, and comparing information, which is exactly what was going on in cases like Capital One, which my friend didn't mention, but which is very important here. There you had comparing XML documents in a more functional way to allow a user to reconcile different XML documents in different XML languages by parsing it down into hierarchical structures, trees, in fact, the patent there calls them, and we've reproduced an example of that where it's very elaborate. You have a header. You have multiple nodes. It looks exactly like a syntax tree. Well, Mr. Frankel began his argument this morning by jumping, as we have done on occasion, from step one to step two, I guess on the theory that there is some form, depending of abstract idea, that one might find this to be directed to, but there's more specific, you know, saving inventive concepts in some of the details. So what about that? So I'm happy to jump there, Your Honor. And what I heard him say, and this is consistent with his brief, is that there's something more than simply comparing data. And just to be clear, once you're at step two, you look at what the abstract idea is, and as Your Honor noted, take that out. So you can't rely for the inventive concept on the abstract concepts of parsing, of comparing, of digesting, of standardizing. Those are all – So maybe I misheard, but I guess I understood Mr. Frankel to be on the step two question aspect, not focusing on the comparing part, but on the steps before the comparing, the how one gets to the two comparators.  So what about that? Sure. The how ultimately almost, with one exception which I'll talk about, collapses into the abstract idea because the how that he talked about is first parsing things. So take the data and parse it. This Court has held that that's abstract, right? It's what people do when they read a sentence. You think back to grade school diagramming sentences, right? You're putting it into a syntax tree and you're parsing it out. That's literally what you're doing. And then you're normalizing. In some grade schools. Yes, Your Honor, at least in mine. I can only speak to my experience. So then you're parsing out. Then you're normalizing. Well, here's where the rubber really hits the road, to borrow one of their phrases, because the normalization that you have to do here is simply remove a white space. And so if there's some magical how about kind of reconciling what this sentence over here, let's call it in English, and this sentence over here, call it in French, according to the claim construction, all the system has to do is pull out one single white space. And then even if those mean the exact same thing, the system that they've claimed will flag it as different. That is a false negative. They have in no way solved the false negative problem with the claims as construed. And that's the key. So that normalization step is what's doing all the work or most of the work for them to create the canonical form. And the district court at the motion to dismiss stage wasn't clear on whether removing white space would be enough. And that was the key reason why he denied motion to dismiss. As he later explained in summary judgment, it's now clear because they acknowledged and admitted at the summary judgment hearing that removing white space would be enough. And he said, well, that's- Help me understand. I guess I didn't quite understand how you were connecting the question of routine, conventional, whatever, to this would not solve the problem. Right. So first looking at step two, what is apart from the abstract idea? I think they're interrelated. So my only point there was you take out what are the abstractions. And so maybe I was talking a little bit more about the fact that normalizing is abstract, as is digesting, which is hashing. In personal web, this court squarely held it's abstract. So my only point is you take those out at step two and say, what else is there? And I mentioned the caveat. There might be something else here in the form of the syntax tree. That's about the only thing I can find. And if you look at Dr. Min's testimony, that's about the only thing that I can find in his testimony that's outside that abstract idea. And this is at paragraphs 896 through 902 of his expert report, which that's where he talks about step two. And you'll see there what he talks about is in terms of the claims as a whole. That's the key problem here. And he even goes so far as to say these claims are eligible because they are, quote, novel and non-obvious. That's at paragraph 896. And he further says because they are, quote, not anticipated. That's at 899. That shows that he's doing the wrong analysis. He's not looking beyond the abstract idea. He is including the abstract idea in his analysis. And so when he says it's non-conventional, if you come up with a brand new abstraction that may or may not be non-conventional, that doesn't make it eligible. That goes to novelty. And what they're really saying is just apply it in the chip design field. So these concepts in Capital One, in Berkheimer itself, parsing and so forth, in personal web, hashing and comparing, applying those in a new context of chip design, and that's what in the summary judgment hearing below, that was the only reason that they distinguished the Brin reference. And so my friend talked about the Brin reference, so I will as well. That was evidence we put forth, and the court doesn't even need to get to it because we think it's clearly mental steps, and so it doesn't matter whether it's new. But even if you wanted to look at whether this combination was somehow new and different, the Brin reference we put forth as evidence that these are longstanding computer concepts. So even in the computer realm, it used an almost identical language. It said creating a canonical form. That was one of the steps in Brin. It said hashing that. It talked about parsing it, didn't use the word parse, but dividing things into sentences based on tokens, like periods for end of sentences, and ultimately comparing the hashes to determine whether two things were the same. There is no meaningful difference between that and what we have here, and we know there's no meaningful difference because when at the hearing they finally addressed it. And to be clear, their expert never addressed Brin. Not once. Did not dispute that those concepts in the computer realm were long known. Never addressed it. Full stop. Their opposition to summary judgment. Never addressed it. Full stop. Finally, at the summary judgment hearing, here's how they addressed Brin. Brin is in a completely different field of technology. That's why it's completely irrelevant. I haven't seen anything like that in circuit design. It's not conventional, quote, in the relevant field. That's at pages Appendix 74, 81 through 83, and the district court quoted one of those in a footnote. So it's clear all they're doing, that's a classic field of use limitation. It's precisely what this court said in Capital One. You can't limit it to XML language and suddenly make these data manipulation steps meaningful for eligibility. It's exactly what the court said in electric power, where you can't limit the field of the data analysis to electric power grids. It goes all the way back to Fluke, where you can't limit it to the petrochemical field. So that's a very clear indication we would submit that there is no evidence at Step 2 that helps them. And I would like to comment just briefly on their TI witnesses. So they mentioned the notion that the Texas Instruments witnesses testified that this is a useful concept. But if you look at that testimony, those witnesses were praising the software that OASIS developed. Now, OASIS may have developed a really terrific piece of software for actually figuring out whether things are the same or different, despite being written in different languages, but that's not what they claimed. What they claimed is something that could be as simple as ultimately a mental step of removing white space. So, for example, the Vickery witness praised the software and, in fact, had, quote, no memory of the patent app. That's at page 16189 of the appendix. What might there be in the software that goes beyond what's in the claim? Thank you, Your Honor. So, actually, Dr. Min looks at the software, and in appendix, excuse me, exhibit C and D to his report, he walks through their software and aligns it with the claims. Now, those are under seal, so I won't get into the details. But if the court looks at those, it's clear to me, for example, at page 17551, that the software must be doing something more than simply removing white space. It does something more than that to actually do something useful like figure out, hey, these two things, these two parts of these files are actually the same, even though written in completely different languages, right? There's nothing in the claims that tell you how you would do that. That would be a really useful invention. But they didn't claim that. They claimed something very, very broad. And I should note, it's not surprising that it's so broadly claimed with only generic computer functionality because these were pre-ALICE patents. And they even referenced the Beauregard case in column 81 of the patent, which is kind of a tell for me because that's the case that formerly said all you have to do to make something eligible is add some generic computer functionality. And that, of course, was removed in ALICE and overturned ultimately in ALICE. That's not enough. So, again, that's not dispositive here, but I think it's a little bit of a tell. Returning then to the testimony, the testimony that they point to said that folks were, quote, thrilled about the software. Well, I don't know about you, and I'm not in the industry, but I presume it had to do something more than simply remove white space if they were thrilled about it. So what they were talking about was the actual piece of software. Not all of those functions were claimed. The useful bits of it in terms of figuring out non-functional and functional differences weren't claimed. And we know from cases going all the way back pre-ALICE to Accenture coming through to the modern cases that you can't just rely on details in the specification. ALICE, they talk about columns of details. ALICE had over 100 pages, not just columns, 100 pages of details about the software, including the different variable names and so forth. Accenture had columns and columns. You look at patent after patent. In the mentor graphics case, for example, that was in the closer to the chip design field. It was electrical circuit design. It was snippets of code about how you would, you know, convert a functional description into a hardware description of an electrical circuit. Computers ultimately weren't claimed in that, but the point just is that you can't rely on the specification. The specification there talked about computer implementation. Ultimately, this court said that's not what's claimed. It's what's claimed that mattered. And what here we have is very generic claims as construed by the district court. We think the district court, therefore, was- Can I just ask you I think the same question I asked Mr. Frankel?  Is there anything in the claims that requires a certain size of the design that we are- that this method applies to? No. The answer is no, Your Honor. I mean, the specification even talks about it can have a header and or cells. The files, the number of files, it talks at one point that two is a generic reference, and it can be two or more, right? So if you want to think about unclaimed details, the semantic case is a great one because there it talked about- the spec talked about the volume problem. And ultimately, this court said that may be fine and well, but the claims don't address a volume problem. And we think even if it did address a volume problem, it would have to tell you how to do it in a meaningful way to address the problem that they have identified, which is this false negative problem. And their claimed invention, again, putting aside the software, which may be terrific, their claimed invention doesn't tell you word one about how to do that, other than the exact steps that this court has found amount to mental processes, parsing, standardizing, digesting, and comparing. So for that reason, unless the court has further questions, we respectfully ask you to affirm. Thank you, counsel. Thank you. Mr. Frankel has the model. Thank you. With respect to the Capital One case that my friend discussed, the decision says that the mere fact that the inventor applied coined labels to conventional structures does not make the underlying concept inventive. So that case turned on the fact that the structures were conventional. There should not have been a finding here that the canonical form digest was conventional. That was based entirely on the Brin article. We know from the Berkheimer case that the mere fact that something is disclosed in a piece of prior art, for example, does not mean it was well understood, routine, and conventional. That's a single article. And by the way, Dr. Min did not concede and disagreed that the Brin article disclosed the subject matter of the asserted claims. Now, when my friend said that Dr. Min did not discuss the Brin article specifically in the context of 101, that omits that there's an entire section in his validity rebuttal report explaining how the Brin article is very different from what these claims covered. Then in his discussion of 101, he says, as I've talked about in my discussion of anticipation and obviousness, the references that defendants have identified are different from what these claims cover. These claims provide an improvement to computer functionality. They don't make humans' lives easier. They make computers better. With this claimed technology, it was now possible for a computer to compare two design files and determine where they were the same and where they were different, even when the functionality was described differently. That was not possible before. No one has shown that capability in the prior art, and that's a fact-intensive question that should not have been decided on a dozen pages of summary judgment briefing. Dr. Min should have testified to the court and explained how Brin was different. Dr. Min should have had a chance to explain why this was a difference. Can I ask you sort of, I guess, a doctrinal question about routine, conventional? Is your understanding that something can meet that if it is extremely widely known but nobody has put it into practice just because they've got other things to do or they didn't think it was that useful, but just very, very well known? So that if, for example, everybody knew from Brin's 1995 article about these ideas of parsing and to generate something that you're going to compare, but nobody had yet put it into widespread use, would that qualify or not? So if I understand your question, you're saying there was no anticipation and maybe not even obviousness, but everyone in computer school read the Brin article, fully understood its teachings, and based on those teachings, this would have been a routine thing. It's just no one cared enough to get around to it. If that were the case, then yes, I would agree it was not routine and conventional. Here, however, we have Texas Instruments. You would agree that it would be routine and conventional? Yes, it would be routine and conventional. Here, however, we have the opposite situation. We have Texas Instruments. These people knew everything that was routine and a whole lot more, and they were losing tens of millions of dollars a year because they couldn't figure out how to identify. If they find one bad cell and they say, okay, we've got a library of 10,000 designs. How do we find where that cell is in the 10,000 designs? It was impossible, and they were losing tens of millions from that. This is the testimony of their engineers. And then they went to OASIS, and they said, you're the guys who invented the OASIS language. We've got a problem. Help us out. OASIS came up with the solution, and they said, that's great. They said, your software works. Now, we should not have to speculate what it was about the software that they liked, or counsel sort of presumed that there must have been something in the software that was different than what's in the claims. That's a factual question. We can ask Mr. Vickery what it is about the software that he liked. We can ask Dr. Min why he came to the conclusion that the scope of the software is coextensive with the scope of the claims. Therefore, our summary judgment was improper. Thank you to both counsel. The case is submitted. Thank you.